Filed 4/17/13  P. v. Ceras CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARCOS CERAS,<br><br>    Defendant and Appellant. | B240200<br><br>(Los Angeles County<br>Super. Ct. No. PA047668) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Shari K. Silver, Judge.  Affirmed.

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Pamela C. Hamanaka, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Marcos Ceras appeals from the judgment entered following a jury trial in which he was convicted of attempted murder, shooting at an inhabited dwelling, and assault with a firearm, with findings defendant personally fired a gun and personally inflicted great bodily injury. Defendant contends the trial court erred by denying his motions contesting the prosecutor's use of a peremptory challenge against a prospective juror and seeking dismissal due to the destruction of evidence by the police. We affirm.

## BACKGROUND

Defendant and Martha Chavez were married and had a daughter who was born in 2002. Chavez's family did not want her to be with defendant because he physically abused her. In 2003, defendant punched Chavez in the face, causing a cut and bruising. He was convicted of misdemeanor infliction of corporal injury on a spouse based upon that incident. Chavez continued to live with defendant after that incident because she felt she could not be without him. At one time, defendant lived with Chavez at 11172 Telfair Avenue in Pacoima, but as of at least May 2, 2004, defendant no longer lived in the home. (Undesignated dates pertain to 2004.) Chavez and her daughter continued to reside there with members of her family.

On May 2, defendant picked up Chavez and their daughter and they went to a park. Defendant asked Chavez to get back together, but she refused, saying she could not be with him because her family was opposed. Chavez later told Los Angeles Police Department (LAPD) Detective Andrew Barkman that defendant said that if he could not have her, no one else could, and he was going to kill her. Chavez testified at trial that she did not take defendant's statement seriously.

Later on May 2, Chavez discovered that her car, which she had parked near the home of defendant's mother, had been burned. When Chavez told defendant, he laughed. Chavez told Barkman that she confronted defendant about the car and he admitted he had burned it.

About 10:00 to 10:30 p.m. on May 3, defendant repeatedly phoned Chavez, who was at home at the house on Telfair with her family, including Juliana Dedios and

2

Alfredo Rodriguez, both of whom knew defendant. Defendant wanted to see his daughter, but Chavez said their daughter was sleeping. Defendant and Chavez argued. Chavez disconnected the phone because she was tired of hearing it ring. About five minutes later, defendant arrived at Chavez's house. Defendant stood outside an open window that was next to the front door. The window had a metal security screen. According to Rodriguez and Dedios, the porch light was on; according to Chavez, it was off. Chavez, Dedios, and others were seated at a table and Rodriguez was near the window, face-to-face with defendant. Rodriguez and Dedios testified they could clearly see defendant standing outside the window and he was alone. Chavez testified that she recognized defendant's voice and could also see him as he stood outside the window. On cross-examination, she testified she saw "two shadows" "on the carport," but conceded she did not tell this to police officers or a social worker to whom she later spoke.

Defendant asked to see his daughter, and Chavez refused. They argued through the window's security screen. Chavez told defendant to leave and said she was going to call the police. She stood up and walked toward the counter where the phone was located. Chavez testified she heard shots and began running toward the back door. At trial she denied that she saw defendant with a gun; she simply assumed defendant had a gun because she heard gunshots. Chavez told Barkman on May 4 that she saw defendant use his right hand to remove a small gun with a four-inch brown handle from his right front trouser pocket, then saw defendant manipulate the gun with his left hand, and after seeing this, she began running, then heard three shots. Rodriguez testified Chavez said, "He has a gun," and Dedios testified Chavez said, "Oh, my God" as she looked toward defendant. Dedios told Officer Melissa Sanchez on the night of the shooting that Chavez gasped right before defendant began shooting. Dedios told Barkman on May 4 that Chavez gasped, covered her face, and began to run just before defendant began shooting. Rodriguez testified he saw defendant shooting, and after the first two shots, Rodriguez dove to the ground to shield his young daughter. Dedios testified defendant extended his arm and she saw "sparkles" coming out of the barrel of the gun. Both Rodriguez and

3

Dedios testified defendant fired four to six shots. Chavez ran toward the backyard as defendant fired. When defendant stopped shooting, he ran. Dedios testified defendant was still alone when he ran away.

Chavez testified that when she reached the backyard, she realized her left leg felt hot and she saw blood. She jumped two fences and knocked on neighbors' back doors for assistance, but no one responded. She attempted to jump fences to get back to her own yard, but passed out in a neighbor's yard. A single bullet had passed through Chavez's left thigh, created a large hole in a major vein, then entered her right thigh, where it remained. Surgeons inserted an artificial vein to repair the injured vein. Chavez had lost more than half of her blood and was in shock when she was first treated at the hospital. She remained in the hospital for seven days. Even after repair, the vein injury created the potential for lifelong problems, including blood clots. Chavez testified she has scars and at the time of trial in late January of 2012 she still experienced pain and numbness from time to time.

Salvador Orozco testified that his house was located on Telfair, across the street from the house next door to Chavez's home. He knew both Chavez and defendant from school. About 10:00 p.m. on May 3, he was outside, in front of his house, and had a clear view of Chavez's house. A streetlight in front of Orozco's house was on. Orozco saw defendant inside the yard of Chavez's home, walking toward the house. Orozco heard Chavez scream, "Go away." Orozco then heard what sounded like banging on the security screen with something made of metal. Orozco then heard three gunshots and saw defendant running away from Chavez's house, out the front gate, and down Telfair toward Desmond Street. Defendant was alone the entire time Orozco observed him.

Benito Macias, who lived in the house behind Chavez's house, testified that he heard about six gunshots from the vicinity of Chavez's house on May 3, between 10:00 and 10:30 p.m. Soon thereafter, Chavez knocked on Macias's back door asking for help. By the time Macias got to the door, Chavez was gone. Macias walked to his back fence and looked over. He saw an older woman who was frantic and screaming that her

4

daughter had been shot by her daughter's boyfriend. Macias saw Chavez in a different yard and directed the police and paramedics to her when they arrived.

Officer Sanchez testified that she was one of the officers who responded to Chavez's house after the shooting on the might of May 3. Chavez was bleeding and there was blood on exterior walls. Chavez was conscious, and Sanchez asked her who shot her. Chavez replied, "Marcos Ceras." Sanchez walked down the street to a cul-de-sac, where she saw a white car parked in a driveway, with the keys in its ignition. At trial, defendant agreed (but did not stipulate) the car was one he was known to drive, and fingerprints found on the outside of the driver's door window and hood were matched to defendant. No match was found for other fingerprints lifted from the car. On the night of May 3 Sanchez interviewed Salvador Contreras, who lived in a house on the cul-de-sac, about six houses from Chavez's house. Contreras told Sanchez that he saw the white car parked in front of his house and saw two Hispanic men seated in the front seat of the white car. Contreras told Sanchez that he watched the car from his front window for about 30 minutes and saw the driver get out of the car and talk on a mobile phone, then walk down Telfair. Contreras told Sanchez that the passenger remained in the car for about 10 minutes, then he also got out and walked down Telfair.

Chavez told Officer Samuel Huizar on the night of May 3 and Barkman on May 4 that defendant came to the house to see their daughter, Chavez and defendant argued, then defendant shot Chavez. She did not mention seeing two people or shadows of two people to either officer. She told both officers they might find defendant at his mother's home on Kraft Avenue in North Hollywood. Chavez also told clinical social worker Mary Kincaid, who spoke to Chavez in the hospital, that she feared her husband because he shot her. Chavez did not mention a second shooter.

The police observed two bullet holes in the metal security screen on the front window where the witnesses said defendant had stood. The wires on the screen were bent inward, consistent with shots being fired into the house from outside the screen. The police also observed three bullet holes on a wall dividing the living room from the

5

kitchen, and two strike marks on some cabinets in the dining room area. Two of the three bullets that entered the wall apparently remained in the wall and were not recovered. One bullet went through a satellite television antenna and ended up in a kitchen drawer. There was one drop of blood in the house, somewhere between the kitchen and the back door, and more blood in the backyard. Detective Margaret Brownell collected three bullet fragments—one from the dining room next to the cabinets displaying bullet strike marks, one from the kitchen floor, and one from a kitchen drawer. No casings were present and no gun was ever recovered in this case. Brownell testified that a bullet can change course, deform, or fragment when it strikes something. Brownell opined that at least five shots were fired, based upon the three bullet holes in the wall and the two strike marks on the cabinets. Those strike marks were in a downward direction. Brownell also testified that the porch light was on when she arrived at Chavez's house on the night of the shooting, and a person in the living room-dining room area could clearly see another person standing outside the window where the holes in the security screen were. On May 4, Barkman visited the house and residents gave him a slug they said they found inside a Sparklett's bottle and five metal fragments that appeared to be bullet fragments.

Rodriguez and Dedios testified that the holes in the window screen, the holes in the wall, the hole in the satellite television antenna, and the strike marks on the cabinet were not present before defendant began shooting on the night of May 3.

Barkman obtained a warrant for defendant's arrest on May 4 and asked the Fugitive Task Force to search for defendant. Officers repeatedly conducted surveillance at defendant's mother's house, and one of those officers noticed a burned out car. He did not know its significance at the time, and when he returned to the site after learning about Chavez's burned car, the car was gone. In June and September, Chavez told Barkman that defendant had contacted her and she attempted to help the police find defendant. Defendant was finally arrested on December 21, 2009, by an officer investigating a small child left in a car at 1:30 a.m. Defendant told the officer his name was Marcos Mora. Later the same day defendant's true identity was determined through fingerprints.

6

On March 12, 2009, Lieutenant William Matthews ordered the destruction of the physical evidence in this case, pursuant to an order from an LAPD bureau chief to reduce the contents of the Foothill Division property room to 65 percent of its capacity as quickly as possible. The order indicated that Matthews should discard items that had been stored for five years or more. Matthews had told the bureau chief that destroying evidence might create legal issues, but the chief just told him to get the percentages down. Matthews ordered the destruction of 200 to 300 items of property. Department protocol required Matthews to review the case notes to determine the status of a case before disposing of its evidence. Matthews erred by only superficially reviewing the case notes in this case. He did not realize that there was an outstanding arrest warrant for defendant and, if he had realized this, he would not have ordered the destruction of the evidence in this case. Department protocol also required Matthews to contact the investigating officer, but Matthews did not do so. The property clerk was supposed to follow a similar process, but at the time the property clerk at the Foothill Division was new and in training. Matthews characterized the destruction of the evidence in this case as a mistake and a failure of the police department's systems. Matthews had no connection to this case, other than ordering the evidence destroyed.

In January of 2010 Barkman subpoenaed Chavez to appear at defendant's preliminary hearing. Chavez said she did not want to testify because she did not want defendant to be incarcerated. Instead, she wanted him to be working and paying her with child support. Chavez failed to appear for the preliminary hearing several times, causing it to be continued. Eventually, she appeared and testified.

In May of 2011 Brownell returned to the crime scene. The metal window security screen had not been repaired or replaced, and the bullet holes and strike marks inside the house were still visible, notwithstanding patching and painting. Brownell and her partner shone a laser through the holes in the window screen and were able to line it up with the holes in the wall. Photographs of their experiment were admitted in evidence.

Defense firearms expert Patricia Fant viewed crime scene photographs, but did not attempt to visit Chavez's house. Fant testified that police could have conducted a chemical test on the holes in the metal security screen, holes in the wall, and marks on the cabinets to determine if they were made by bullets. But after seven years such a test probably would not have been useful. Fant conceded that the holes in the security screen showed wires turned inward toward the house, they could have been caused by firing multiple bullets through it from outside the house, and if the home's residents testified that the screen was not damaged before someone fired a gun through it, then the holes were probably caused by the shooter. Fant testified that the holes in the wall, the hole in the satellite antenna, and the marks on the cabinet were probably made by bullets, and she opined that at least five, and possibly six shots were fired into the house. She agreed that it would be easy to fire from outside the house through the security screen and cause the bullet holes in the wall. She further agreed that bullets that strike objects can change direction. But she opined that, based on her review of the photographs, it did not appear possible for shots fired through the holes in the window security screen to have made the strike marks on the cabinets. To make those marks, she opined, the shooter would have had to be farther to the right of where the holes in the screen were.

Fant further noted the failure of the police to recover the bullets that remained in the wall and testified that if she had been able to examine the bullet fragments and slugs, she may have been able to determine whether they were all fired from the same gun, depending upon the size of the fragments and whether the lands and grooves were visible. Fant further noted that the police could have used trajectory rods to determine the bullets' trajectories and the shooter's location.

Salvador Contreras testified for the defense about seeing the white car parked in front of his house. He testified he saw "two shadows" in the car that he supposed were people. He went into his house and had dinner. He later saw that the white car was still there, and about 45 minutes later he heard helicopters and the police. He remembered that at some point he saw a person walking down the street. Contreras recalled that he

8

told the police that he had seen two Hispanic males sitting in the front seat. He did not recall whether he told the police anything about a mobile phone or people walking down the street. At the preliminary hearing, Contreras testified that he saw two people in the front seat of the car.

When recalled by the defense, Officer Sanchez testified that in her brief interview with Dedios on the night of May 3, Dedios did not say she saw a gun or describe the path in which Chavez moved. Dedios did tell Sanchez that defendant came up to the window, argued with Chavez, then began shooting. Sanchez also testified that in the initial investigation of the shooting, the police had three different descriptions of what defendant was wearing, but defendant was the only suspect because, according to the witnesses, he was the only one standing outside the window when the shooting occurred.

District Attorney Investigator John Cheslock testified that when he interviewed Orozco on May 3, 2011, Orozco said he ran for cover when he heard the gunshots, and after he stopped, he looked across the street and saw defendant running away from Chavez's house and down the street in the opposite direction from the cul-de-sac. Orozco said defendant was alone.

The jury convicted defendant of attempted murder, shooting at an inhabited dwelling, and assault with a firearm. The jury found that defendant personally fired a gun (Pen. Code, § 12022.53, subd. (c); undesignated statutory references are to the Penal Code), personally fired a gun causing great bodily injury (§ 12022.53, subd. (d)), and personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)), but the jury could not reach a verdict on an allegation that the attempted murder was willful, deliberate, and premeditated. The court sentenced defendant to prison for 10 years 8 months, plus 50 years to life, consisting of a term of 9 years for attempted murder, plus an enhancement of 25 years to life pursuant to section 12022.53, subdivision (d), plus a consecutive term of 1 year 8 months for shooting at an inhabited dwelling, plus an enhancement of 25 years to life pursuant to section 12022.53,

9

subdivision (d).  The court stayed the sentence on the assault with a firearm conviction pursuant to section 654.

## DISCUSSION

**1.     Denial of *Wheeler-Batson* motion**

Defendant contends the trial court erred by denying his motion based upon *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712] (*Batson*), challenging the prosecutor's exercise of a peremptory challenge against a female African-American prospective juror.

A party violates both the California and United States Constitutions by using peremptory challenges to remove prospective jurors solely on the basis of group bias, that is, bias presumed from membership in an identifiable racial, religious, ethnic, or similar group.  (*Wheeler*, *supra*, 22 Cal.3d at pp. 276–277; *People v. Lancaster* (2007) 41 Cal.4th 50, 74.)  A party who believes his opponent is doing so must timely object and make a prima facie showing of exclusion on the basis of group bias.  (*Wheeler*, at p. 280.)

If a prima facie case is shown, the burden shifts to the other party to show that the peremptory challenge was not based solely upon group bias, but upon a "specific bias," that is, one related to the case, parties, or witnesses.  (*Wheeler*, *supra*, 22 Cal.3d at pp. 276, 281–282.)  "A [party] asked to explain his conduct must provide a '"clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.' [Citation.]  'The justification need not support a challenge for *cause,* and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.]  A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citations.]  Nevertheless, although a [party] may rely on any number of bases to select jurors, a legitimate reason is one that does not deny equal protection." (*People v. Lenix* (2008) 44 Cal.4th 602, 613 (*Lenix*).)  Although a party may exercise a peremptory challenge for any permissible reason or no reason at all, implausible or fantastic justifications are likely to be found to be pretexts for purposeful

discrimination.  (*People v. Huggins* (2006) 38 Cal.4th 175, 227; *Purkett v. Elem* (1995) 514 U.S. 765, 768 [115 S.Ct. 1769] (*Purkett*).)

Subjective matters, such as a prospective juror's body language or the way in which he or she answered questions are adequate specific bias or race-neutral grounds for a peremptory challenge.  (*Wheeler*, *supra*, 22 Cal.3d at p. 276 ["'bare looks and gestures'" cited as an example of a permissible specific bias]; *People v. Johnson* (1989) 47 Cal.3d 1194, 1217–1219 ["tired" appearance, defensive body position, sympathetic looks at defendant].)  The United States Supreme Court has noted that "race-neutral reasons for peremptory challenges often invoke a juror's demeanor . . . ."  (*Snyder v. Louisiana* (2008) 552 U.S. 472, 477 [128 S.Ct. 1203] (*Snyder*).)

The trial court must then make a sincere and reasoned attempt to evaluate the explanation for each challenged juror in light of the circumstances of the case, trial techniques, examination of prospective jurors, and exercise of peremptory challenges.  (*People v. Fuentes* (1991) 54 Cal.3d 707, 718.)  It must determine whether a valid reason existed and actually prompted the exercise of each questioned peremptory challenge.  (*Id.* at p. 720.)  The proper focus is on the subjective genuineness of the nondiscriminatory reasons stated by the prosecutor, not on their objective reasonableness.  (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.)  "[T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy."  (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 339 [123 S.Ct. 1029].)  "In assessing credibility, the court draws upon its contemporaneous observations of the voir dire.  It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her."  (*Lenix*, *supra*, 44 Cal.4th at p. 613.)

Because *Wheeler* motions call upon trial judges' personal observations, we "review the decision of the trial court under the substantial evidence standard, according

11

deference to the trial court's ruling when the court has made a sincere and reasoned effort to evaluate each of the stated reasons for a challenge to a particular juror." (*People v. Hamilton* (2009) 45 Cal.4th 863, 900–901, fn. omitted (*Hamilton*).) "'We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]'" (*Id.* at p. 901.) "On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." (*Snyder*, *supra*, 552 U.S. at p. 477.)

Defense counsel made a *Wheeler-Batson* motion challenging the prosecutor's exercise of peremptory challenges against two prospective jurors who were African-American. Defendant's appellate claim is limited to one of two jurors addressed in the motion: Prospective Juror No. M7136, who occupied seat 16 during voir dire. Prospective Juror No. M7136 was an administrative assistant for the Department of Defense with no prior jury service. Her late husband had been a school custodian. She had a 15-year-old child in high school and a 25-year-old daughter in graduate school at Yale, studying nursing. The prosecutor, Tamar Tokat, asked Prospective Juror No. M7136 just one question, which pertained to whether she would "have a problem" with not being "able to hold on to some physical evidence," even though there would be witnesses and photographs. Prospective Juror No. M7136 said she would not have a problem.

As soon as Prospective Juror No. M7136 was seated in the jury box, the prosecutor exercised a peremptory challenge against her. Defendant made a *Wheeler-Batson* motion based upon the peremptory challenges against Prospective Juror No. M7136 and a previously excused prospective juror who knew defense counsel and ran a daycare defense counsel's grandchild attended. The trial court noted that there were very few African-American prospective jurors on the panel and the prosecutor had exercised

12

peremptory challenges against two female African-American prospective jurors. The court found defendant had made a prima facie showing and asked the prosecutor to explain her reasons for exercising peremptory challenges against the two prospective jurors.

With respect to Prospective Juror No. M7136, the prosecutor stated, "And the juror that I just excused is based on demeanor, particularly with me, and also her reaction to [defense counsel] Mr. Mack. She and another juror who was in the audience have been sitting together from the beginning and those two jurors, I noticed them, when Mr. Mack was making jokes yesterday, I noticed that they found him very amusing. [¶] The vast majority of the room, almost nobody else was laughing. They thought he was very amusing. Aside from that, this juror has her hands folded the entire time and when I have walked by her and the other juror, in the hallway, it's a type of attitude I get from them. First of all, it feels like a dirty look and then as I walk by, they start laughing. I have not heard what they're saying, however, it makes me feel uncomfortable, because I don't know if it's a personal thing. [¶] And the last thing I need is somebody on the jury who has a personal problem with me or something about me that doesn't sit well with her. So she's not going to listen to anything I have to say, perhaps, finding Mr. Mack a more appealing presenter of whatever it is he's saying."

Upon questioning by the court, the prosecutor stated that the other prospective juror with whom she had seen Prospective Juror No. M7136 sitting was also an African-American woman, and "they have been sitting in the back of the audience the entire time, from last week until yesterday and also today. And in the hallway, they're always sitting together." The prosecutor also added a second reason for excusing Prospective Juror No. M7136: "When Mr. Mack inquired of the room as to whether, you know, who holds the police in high esteem, I don't recall her raising her hand." The court stated that it believed Prospective Juror No. M7136 had raised her hand. The prosecutor stated that her notes indicated that she was not sure whether the prospective juror had raised her hand.

13

The court stated that her impression of Prospective Juror No. M7136 differed from that of the prosecutor: "To me, her body language, her demeanor, her manner of dress, she appeared to me to be of a much more conservative professional impression rather than somebody younger[,] more hip, more with the times. She appeared to me to be very professional in appearance and her body language and her answers. With a daughter at Yale in nursing, that says to me: This is somebody whose [*sic*] directional, that brought up her kids to value education. [¶] In terms of her sitting in the audience, I believe I did see her sitting in the audience with perhaps one of the few other African-Americans, Blacks in the courtroom. And I'm just not sure that bonding with somebody while you're doing jury service and sitting with them— [¶] [Interruption by prosecutor.] [¶] I'm not finished yet, counsel. [¶] —is an issue. Now, laughing at an attorney's attempts to be funny, the attitude issue that you are sensing, I understand that. I understand that. I'll hear from Mr. Mack."

Defense counsel began his argument by noting that there were four African-Americans in the venire. The prosecutor interrupted him and accused him of misconduct in making the *Wheeler-Batson* motion. The court explained that defense counsel had a duty to make such a motion to represent his client to the best of his ability. Without allowing defense counsel to resume his argument, the court denied the motion. The court first addressed the challenge to the juror who knew defense counsel, finding it race-neutral. The court said, "So the way I'm viewing this Wheeler is I'm concentrating on the second peremptory [Prospective Juror No. M7136]. [¶] And from the description that I heard from Ms. Tokat, the impressions and the body language and laughter or something that Ms. Tokat has perceived in this Court's appearance has—is not exercised to exclude African-American/Blacks from the jury. [¶] . . . However, in terms of appellate reasons, I mean, appellate review, I'm placed in a very difficult situation. Some people find Mr. Mack to be funny. Some people do not. [¶] It's just something that is very difficult to review. Again, I do note from my impression of this juror, she seemed much more on the conservative end. I believe she did raise her hand when asked about

14

law enforcement. But at this point, I don't find sufficient legal or factual cause to grant the Wheeler motion. However, should more peremptories be exercised, it can be renewed."

The prosecutor then made a *Wheeler-Batson* motion challenging defendant's excusal of "White women." Before hearing argument on that motion, which the court ultimately denied, the court allowed defense counsel to finish his argument on his own *Wheeler-Batson* motion. Counsel argued that the prosecutor would make the same argument against the alleged companion of Prospective Juror No. M7136 if she made it into the jury box, thereby eliminating two African-American prospective jurors and leaving only one in the venire. He also argued that Prospective Juror No. M7136 never made eye contact with him and seemed "very conservative . . . and not defense-oriented at all." He perceived her as "rather cold" to him. The court stated it would not address the issue of the other prospective jurors at that time, and said, "So now, I've made my ruling on the record." But the court said it would adjourn for the day without excusing Prospective Juror No. M7136 because the court had "a right, before I excuse her, to change my mind. So I may think about it at this time." The court added, "I may need to do some further research."

The next morning, the court noted that it had not excused Prospective Juror No. M7136 the prior day in order "to give me some time to think about the issues." Defense counsel noted that "those two jurors are out there sitting out in the hall right this second. They're not sitting together, and they are not talking to each other." Judge Silver went out into the hallway to observe the prospective jurors.

Upon Judge Silver's return to the courtroom, she noted, "I just walked out of the courtroom into the lobby area outside of Department F, my courtroom, and I observed the jurors. And the two Black, African-American female jurors were not seated together and [*sic*] nor were they speaking with each other. [¶] All right. This is the court's observations and ruling on the situation. Ms. Tokat has described observations that she had of these two jurors. She's articulated on the record what she perceived to be hostility

15

to her specifically by the two female African-American jurors. There is no way for the court to make any type of credibility ruling on this because these are observations that Ms. Tokat made by herself. [¶] It is very common for human beings in an unknown situation, such as being called to court for jury service, to bond with people who are part of the group. And I can conceive of no reason whatsoever why these two particular jurors would feel hostility towards the prosecution. [¶] Mr. Mack is a Black lawyer. Ms. Tokat is not of African-American or Black descent. In this situation, it makes it so difficult for the court to even balance both sides. [¶] The way I am going to handle this is as follows. I am concerned about the defense Wheeler motion, and that's why I indicated that I would think about it at night. [¶] I have already said that the African-American woman who was excused, who had contact as a preschool teacher with Mr. Mack's grandson, and with Mr. Mack's wife and with Mr. Mack himself, and prior to coming into the courtroom even spoke a greeting to Mr. Mack, I am not viewing that at all as an excusal on race grounds. Because with that contact, in my mind I'm treating it as if it was not at all based upon race or nationality. So at this point, I see it as an excusal of one African-American female. [¶] Now, Ms. Tokat indicated that she believed the two African-American jurors were speaking together and sat in the audience together, at least one of the days; that there was hostility exhibited to her. [¶] If the other female African-American juror is called into the jury box, we can deal with it as it comes up. [¶] But at this time, I am denying the Wheeler motion for the reasons stated. However, I still am concerned. [¶] All right. That's my ruling."

The parties continued to argue the motion and the prosecutor stated that defense counsel was calling her a racist and accused defense counsel of attacking her by commenting on her shoes. The court directed the prosecutor to "stop the outrage that this is a personal attack on you" and ordered both counsel not to "comment to each other about their personal attire or their personalities or their method of lawyering." Defense counsel requested that the court ask Prospective Juror No. M7136 whether she had raised her hand when he asked which jurors held the police in high esteem. The court stated,

16

"And I believe she raised her hand 'Yes.'" Defense counsel agreed. The court continued, "But as Ms. Tokat has indicated, her main reason for excusing this juror was because of her—Ms. Tokat's perception of the demeanor and mannerisms of [Prospective Juror No. M7136]." The prosecutor began to reiterate her explanation. The court stopped her, saying, "You indicated. You said that. You've made the record. I understand. [¶] I've ruled. I've denied the Wheeler motion. [¶] It's over. We don't need it repeated." When the prospective jurors returned to the courtroom, the court excused Prospective Juror No. M7136.

After the jury was sworn, the court noted for the record that there was one female African-American juror seated, apparently as Juror No. 12. The court inquired of the prosecutor whether that juror was the companion of Prospective Juror No. M7136 to whom the prosecutor referred in her explanations for her use of a peremptory challenge against Prospective Juror No. M7136. The prosecutor responded, "[T]his line of questioning is inappropriate at this point." The prosecutor then suggested that "we need to take a break" because "I'm not sure your honor is feeling well at this point, starting from the rolling eyes." The court explained it was simply trying to make an adequate record for appellate review. Defense counsel requested that the court ask the seated African-American juror whether she and Prospective Juror No. M7136 sat together and made faces or giggled at the prosecutor. The court declined to do so and stated, "Counsel, I understand your desire. And I thought about this issue extensively the night that I was thinking over the first Wheeler motion. And I did not do any research on the law. But I thought about our court system and how I would like to be treated as a juror in the courtroom. [¶] And this is not a situation where jurors were deliberating and I had to find out whether certain things were said or done that were against the instructions that I give jurors. This was a perception that Ms. Tokat made—I'm sorry—observed, and she described it on the record. [¶] . . . [¶] The importance of, in my opinion, the Wheeler motion that Mr. Mack made and Ms. Tokat's response, as I said on the record at the time, Ms. Tokat described her observations of body language and verbal images. Nobody can

17

be in Ms. Tokat's head over something like that.  Okay? [¶]  And I am not going to put Juror No. 12 in an uncomfortable situation for something that I believe at this point becomes irrelevant and moot—not irrelevant but moot since she's already been sworn in as a juror."

Defendant first argues that the trial court erred by ruling that the prosecutor's peremptory challenge against Prospective Juror No. M7136 was not of constitutional magnitude because the court said, "'I see it as an excusal of one African-American female.'"  Defendant has taken the court's statement out of context.  The court was explaining that it found the prosecutor's reason for excusing the other prospective juror who was the subject of defense counsel's *Wheeler-Batson* motion to be based upon specific bias, not group bias, in that that prospective juror was an acquaintance of, and friendly toward, defense counsel.  Accordingly, the court was focusing its analysis and remarks upon Prospective Juror No. M7136.

Defendant next argues that "the trial court made a sincere inquiry into the genuineness of the prosecutor's reasons, but it failed to make a determination as to their credibility. . . .  [A]nd it did so under the erroneous belief that it could put off this determination because just one juror was involved."  In support of this argument, defendant cites the trial court's statement that "'[t]here is no way for the court to make any type of credibility ruling on this because these are observations that Ms. Tokat made by herself.'"  Defendant further argues, "In refusing to make a factual finding as to whether the prosecutor's reasons were bona fide its abdication is inconsistent with the court's obligations under *Wheeler* constituting error that requires reversal.  This is especially so where, as here, the record itself contains ample reason to suspect that the prosecutor's reasons were not bona fide . . . ."  Defendant then cites the acrimonious relationship between the prosecutor and defense counsel and argues, "[T]he prosecutor's vendetta turned into a personal attack based on group bias.  She did not like Mr. Mack, who is Black, and perceived him as a threat to her case.  He made jokes in court and people laughed.  By her own admission, she feared he was more likable than her.  Had

18

Mr. Mack not been Black this entire episode would not have occurred. In her mind, anyone Black was a threat to her case because defense counsel is Black. Blacks would likely side with defense counsel and she might lose all or part of her case. Ms. Tokat, motivated by jealousy, or revenge, or paranoia exercised her excusals based on group bias."

Although the prosecutor was discourteous to both defense counsel and the court, as illustrated in part by portions of the record quoted and summarized herein, defendant's assertions regarding the prosecutor's motivation for her peremptory challenge against Prospective Juror No. M7136 are entirely speculative. The prosecutor stated a race-neutral reason for the peremptory challenge: she perceived Prospective Juror No. M7136 as hostile toward her based upon her observations that (1) Prospective Juror No. M7136 and another prospective juror who sat with Prospective Juror No. M7136 were two of few people who laughed at defense counsel's jokes and (2) Prospective Juror No. M7136 and the other prospective juror gave the prosecutor "a dirty look," then began laughing as the prosecutor walked past them. Notwithstanding the trial court's statements that it had a different impression of Prospective Juror No. M7136 and that it was "in a very difficult situation," the court implicitly found the prosecutor's demeanor-based explanation to be credible. The court denied the motion on that basis and, notwithstanding its later comments and willingness to entertain additional argument by the parties, the court never modified that decision or rationale. Considered in context, the court's statement the next day that "[t]here is no way for the court to make any type of credibility ruling on this because these are observations that Ms. Tokat made by herself," while perhaps poorly phrased, was not a reversal or abandonment of the court's prior implicit finding that the prosecutor's demeanor-based explanation was subjectively genuine. It was instead an observation by the court that it did not observe the conduct to which the prosecutor referred. Given the entire record, we believe the court was simply contrasting the situation before it with one in which the court itself had observed a prospective juror's demeanor and conduct in the courtroom and could use its observations to determine the

19

subjective genuineness of counsel's explanation. But a trial court need not personally observe or remember a prospective juror's demeanor in order to accept counsel's demeanor-based explanation as subjectively genuine. (*Thaler v. Haynes* (2010) 559 U.S. 43, __ [130 S.Ct. 1171, 1174–1175].)

The trial court made a sincere and reasoned effort to evaluate the prosecutor's explanation and determined it was subjectively genuine. The record presents no reason for this court to depart from the principle of according "'deference to the trial court's ability to distinguish bona fide reasons from sham excuses.'" (*Hamilton*, *supra*, 45 Cal.4th at p. 901.)

## 2. Destruction of evidence

Defendant made two pretrial motions to dismiss the charges due to the admitted destruction of physical evidence in this case by the police. Defendant's motions were based upon *Arizona v. Youngblood* (1988) 488 U.S. 51 [109 S.Ct. 333] (*Youngblood*) and *California v. Trombetta* (1984) 467 U.S. 479 [104 S.Ct. 2528] (*Trombetta*), which essentially require law enforcement agencies to preserve evidence that both possesses "exculpatory value that was apparent before the evidence was destroyed" and is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta*, at p. 489.)

Defendant's first motion was denied by Judge David B. Gelfound on the ground that there had been no showing of bad faith. Defendant's trial before Judge Gelfound ended in a mistrial because defense counsel declared a conflict of interest and new counsel was appointed.

Before the retrial, the prosecutor filed a motion to exclude evidence of alleged third party culpability. Defendant responded by filing a new motion to dismiss and a separate motion to admit third party culpability evidence. These motions were heard by Judge Silver.

Defendant's motion to dismiss stated that defendant was arrested on January 1, 2009, and the evidence was destroyed the same month. It cited Chavez's phrasing at the

20

preliminary hearing, where she testified that "they shot me" and Contreras's and Sanchez's testimony at the preliminary hearing about Contreras telling Sanchez that he saw two people in the car in front of his house, the driver used a mobile phone, then got out and walked down the street, and the passenger got out and also walked down the street about 10 minutes later. The motion argued that the destroyed evidence was material to the defense because "the police knew that two men were in the parked car outside of the neighbor's home. Two men exited the car. [Chavez] was clear that she was in the kitchen when shots were fired. Officers who responded to the scene prepared a schematic [] and took crime scene photographs. Based upon the holes in the screen it is unlikely, to the point of impossible, for a bullet to travel straight, turn to the left, and then turn to the right. On its face the ballistics evidence has exculpatory vale [*sic*]." The motion argued that bad faith by the police could be inferred because the LAPD kept the "crucial ballistics evidence for years and them [*sic*] inexplicably destroy[ed] the evidence at the same time the defendant was arrested." The body of the motion referred to exhibits, but none are attached to the copy of the motion in the appellate record, and a comment by Judge Silver chastising defense counsel during the hearing on the motion indicates no exhibits were attached to the filed motion.

Judge Silver commenced her consideration of the motion to dismiss by noting that defendant misstated the dates of the destruction of the evidence and his arrest. She noted that the evidence was destroyed about nine months before defendant was arrested. Lieutenant Matthews testified at the hearing on the motion much as he did at trial, and admitted that neither he nor the property clerk followed departmental requirements with respect to the evidence in this case. He was not involved in this case in any other fashion. Had he known there was an arrest warrant outstanding in this case, he would not have ordered the evidence in this case to be destroyed. Defendant submitted numerous crime scene photographs, a report by his investigator, and Fant's report, and the trial court expressly considered all of these materials, along with Matthews's testimony. After hearing extensive argument, the court denied the motion, stating it found Matthews "100

21

percent credible" and found no bad faith on the part of the LAPD. The court further stated that it found the defense offer of proof regarding the exculpatory value of the destroyed evidence was "speculation and not based upon anything more substantive than a neighbor saying that he saw two people."

During his closing argument at trial, defendant argued that, although he was present, he did not fire any shots, and the shooter was the second person, whose shadow Chavez testified she had seen on the porch and whom Contreras had seen getting out of the white car and walking down Telfair. He based this argument on the location of the bullet strikes on the cabinet, the testimony about where defendant was standing outside the window, and Fant's testimony, and argued the failure of the police to use trajectory rods to analyze the trajectories of the shots deprived him of "total proof." Defendant argued the destruction of the physical evidence by the police was intentional, violated defendant's right to due process, and deprived defendant of any possibility of a fair trial, but admitted he could not "tell you what would have happened had [the bullet fragments] been properly preserved and examined."

On appeal, defendant contends that the trial court erred by denying his *Trombetta* motion because the destruction of the evidence was in "bad faith as a matter of law," and the exculpatory value of the destroyed evidence was apparent before it was destroyed because "[o]nly one drop of blood was found inside the house on the kitchen floor. The rest was outside. [Chavez] did not feel the shot until she was outside. There was strong evidence of the presence of two people at the scene of the crime. Based on the police diagram [of the crime scene] and photos, [defendant's] shots did not strike the victim. The likelihood that the destroyed evidence would have enabled [defendant] to prove that his shots did not proximately cause [Chavez's] great bodily injury was substantial. The prejudice ascribed to the destruction is the difference between a 20 year determinate term and a 25 year to life indeterminate term, in this case, imposed twice consecutively." Defendant requests that we dismiss the section 12022.53, subdivision (d) and section 12022.7, subdivision (e) allegations.

22

As a matter of due process, law enforcement agencies have a duty to preserve evidence that might be expected to play a significant role in the suspect's defense. Such "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta*, *supra*, 467 U.S. at pp. 488–489.) If all that a defendant can say about the unpreserved evidence is that it could have been tested and the results might have helped the defense, the defendant must show that the police acted in bad faith in losing or disposing of the material. (*Youngblood*, *supra*, 488 U.S. at pp. 57–58; *People v. DePriest* (2007) 42 Cal.4th 1, 42.) Negligent destruction of, or failure to preserve, potentially exculpatory evidence, without evidence of bad faith, does not violate due process. (*Youngblood, supra,* 488 U.S. at p. 58.)

"The presence or absence of bad faith by the police . . . must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (*Youngblood*, *supra*, 488 U.S. at p. 56, fn. *.) The trial court's finding on the existence or nonexistence of bad faith is reviewed under the substantial evidence standard. (*People v. Velasco* (2011) 194 Cal.App.4th 1258, 1262.)

The alleged exculpatory value of the ballistic evidence was not apparent before it was destroyed. Chavez, Rodriguez, and Dedios all told the police that defendant shot Chavez as defendant stood outside the front window. The police found two holes in that window's security screen with wires bent inward, consistent with shots being fired into the house from outside that screen. Officers determined that a person inside the room could see someone standing outside that window. As far as the record reveals, none of the witnesses saw two people shooting. Chavez did not mention seeing "two shadows" until she testified at trial, which was nearly three years after the evidence was destroyed. The police had a statement from Contrereas that he saw two men in the white car linked to defendant, but Contreras did not see the shooting and apparently did not hear gunshots. His statement about seeing the passenger walk down the street about 10 minutes after the

driver walked down the street did not tend to show that the passenger also fired shots or even went up to Chavez's home.

Indeed, the alleged exculpatory value of the destroyed evidence is still not apparent. Defendant can only argue that the destroyed ballistics evidence could have been tested and, assuming the fragments bore sufficient lands and grooves, such testing might have established that the bullet fragments and slug were fired from different guns. Given the highly speculative nature of this theory, defendant was required to show that the police acted in bad faith in disposing of the evidence. This he failed to do. The trial court's finding that the LAPD did not act in bad faith is supported by substantial evidence, including Matthews's testimony regarding the reason for the destruction, his lack of any involvement in this case, and his own negligence in ordering its destruction, as well as the date of destruction, which was nine months prior to defendant's arrest. Accordingly, the trial court did not err by denying defendant's motion to dismiss.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


MALLANO, P. J.

We concur:


CHANEY, J.


JOHNSON, J.

24